Gaines *vs* Gaines' Executor and Heirs.

APPEAL FROM THE GREEN CIRCUIT.

*Alimony.   Divorce.   Dower.   Legislative power.*

CHIEF JUSTICE MARSHALL delivered the opinion of the Court.

CHANCERY.

*Case* 69.

9bm295
104   53
104   61
104   65

9bm295
122   253

*February* 2.

Case stated.

IN 1832, Thomas Gaines, then above seventy years of age, being possessed of a considerable estate in land, slaves and personalty, and having children and grand children settled around him, intermarried with Catharine L. Pentecost, then about thirty two or three years of age, a lady possessing but little property, and who had never been married. No long time had elapsed after the marriage, before jealousies arose on the part of the husband's children, with regard to the alleged liberality of the wife in disposing of her husband's property, such as home made cloth, counterpanes, socks, sugar, coffee, &c. &c., in presents to her sister, who lived in the neighborhood, and at one time she seems to have been suspected of purloining a note executed to her husband by her brother-in-law. The dissentions arising from these accusations, destroyed the harmony which should have subsisted between the married pair, and after repeated scenes of crimination and recrimination, in which violent language and gestures were used, and in one instance at least, of personal violence on the part of the husband towards the wife, a separation took place in 1837, under an arrangement by which the husband transferred to two trustees for the benefit of the wife, her clothes, bed and furniture, bureau and some other small articles, a cow and calf, and two debts upon third persons, amounting to about $850, of which, however, $100 was to be paid to himself, as it would seem, for the expense of previous medical attendance upon his wife, and he also relinquished all claim upon two vacant lots in the town of Greensburg, which had belonged to her before the marriage. The trustees, in consideration of the premises, bound themselves to save

GAINES
*vs*
GAINES, &c.
him and his heirs against all claim on the part of the wife, to support during his life and to dower, &c. afterwards. But Mrs. Gaines was not a party to the instrument.

Compl'ts bill filed for alimony in 1842, and answer made cross bill by her husband.
In 1842, Mrs. Gaines filed her bill alleging ill treatment on the part of her husband, and that she had, in effect, been sent from his house under an inadequate provision, and praying for alimony. The husband answered, denying the many allegations of the bill but admitting and justifying, on the ground of great provocation, one instance of violence, and insisting that he had made ample provision for her; he alleged, by way of cross bill, that she had abandoned him and remained absent for five years, and prayed for a divorce. In answer to this cross bill, the wife denied its principal allegations, reiterated her former charges, resisted the prayer for a divorce, and repeated her prayer for alimony.

Supplemental answer and cross bill setting up a divorce.
This answer was filed in November, 1842, and at the next May term, (1843,) the husband filed his supplemental answer to the original bill, in which he states that "since the filing of his original answer, the Legislature of Kentucky, by an act regularly and legally passed, after due notice given to said Catharine, has divorced him from said Catharine, and she is no longer his wife," and he files a copy of said act and pleads and relies upon it as a bar to the claim for alimony.

The act of divorce.
The document filed is an attested copy of the 26th section of an act approved March 10, 1843, in the following words: "Chap. 335, Section 26. *Be it enacted by the General Assembly of the Commonwealth of Kentucky*, That Thomas Gaines, of Green county, be divorced from his wife, Catharine L. Gaines."

The death of defendant and bill of revivor vs executors and heirs asserting claim to dower in the def'ts estate, & for arrearages for alimony.
In January, 1844, Thomas Gaines, then about eighty four or eighty five years of age, departed this life, and in June, 1844, a bill of revivor was filed by Catharine Gaines, against his personal and real representatives, claiming dower in his lands and a widow's distributive portion of his slaves and personalty, and also a large sum for arrearages of alimony. This bill, as well as the previous one, charged that Thomas Gaines had made a

fraudulent disposition of his land and slaves among his children, before his death, and indeed before the separation, in order to defeat the interest and claim of the complainant to alimony during his life and to dower after his death. All the parties interested being made defendants, denied the charge of fraud, insisting first upon the sufficiency of the provision made for the complainant, and the right of their father to distribute his estate among his children, to some of whom, the land had been given and was in their possession long before the marriage; and in answer to the bill of revivor, besides relying on the same facts, they plead and rely on the legislative divorce as a bar to all claim to alimony, dower or distribution.

The only testimony in the record consists of numerous depositions covering more than .200 pages, which purport to have been taken to be read before the Legislature, on the petition of Thomas Gaines for a divorce, and which were, by consent, afterwards introduced into this case. In August, 1847, the cause having been previously submitted, by consent, to the decision of a member of the bar in consequence of the Judge's refusal to adjudicate in the case, a decree was rendered disallowing the bar as set up under the legislative divorce, on the ground that the act was unconstitutional, and rejecting the claim for arrearages of alimony, and for a distributive portion of the slaves and personalty given away by Thomas Gaines in his lifetime, but decreeing to the complainant her distributive share as widow, in the small estate in slaves and personalty belonging to the deceased husband at his death, with an account of hire, and also her dower in one third of the lands of which he was seized during the coverture, with an account of rents, except two parcels conveyed to two of his sons to whom they had been given in possession many years before the marriage, and had so remained until actually conveyed, and indeed up to the decree.

From this decree the representatives of Thomas Gaines have appealed to this Court, alleging that it was erroneous to grant, to any extent, the relief prayed for, and questioning every part of the relief granted; while

*The decree of the circuit court giving dower, & a distributive share of the estate of the dec'd husband.*

Mrs. Gaines complains, by cross errors, of the rejection of her claim to alimony, and of the refusal to decree her dower in all the land referred to, and to allow her the portion of a widow in the slaves, &c., alleged to have been fraudulently disposed of by her husband during the coverture.

The question of the effect of the Legislative action on the question considered.

The main question presented in the case, is as to the effect which the legislative divorce should have upon the rights claimed by the parties respectively. This question, involving the constitutional question of the power of the Legislature to pass special acts of divorce, or the legitimate operation which such acts, if within the legislative competency for any purpose, should have upon rights of property which may be affected by them, is now, for the first time, so far as we know, directly presented for the decision of this Court. This is in reality, the sole question presented by the objections to the decree on the part of the appellants; and in order to disentangle it from all other and minor questions, we shall, before entering on the discussion of this principal one, dispose briefly of the complaint made by the cross errors assigned on the part of the appellee.

The case of Oldham vs Sale, (1 B. Monroe 77) decides, that in land verbally sold by the husband before his marriage and conveyed afterwards, the widow is not entitled to dower.—So if the land be given, as in this case.

1. The case of *Oldham* vs *Sale*, (1 *B. Monroe*, 77,) decides that a widow is not entitled to dower in lands verbally sold by her husband before marriage, and conveyed by him in pursuance of his parol contract, during the coverture; and we think the principle applies to a *bona fide* gift made before coverture, to a child by a former marriage, who takes the possession and improves the land under the gift, claiming it as his own before the coverture, and receives a conveyance from the husband afterwards.

The husband may give away slaves to his children and defeat the wife of dower therein, farther than to secure a support or alimony.

2. With regard to the slaves, &c. given by the husband to his children during the coverture, the wife had no such vested interest in them as authorizes her to assail the gift as fraudulent, either during the life or after the death of the husband, unless it be for securing a support or alimony during the coverture. As widow she is entitled only to a distributive interest in the slaves and personalty possessed by her husband at his death, and can claim none which have been disposed of by him

except on grounds which would authorize him to set aside the disposition, as having been procured by fraud upon him. This was decided in *Petty* vs *Petty*, (4 *B. Monroe*, 219,) and *Petty* vs *Webb*, &c., (6 *B. Monroe*, 468,) in relation to a conveyance made by the husband immediately before his second marriage, in violation of his parol promise to his intended wife, and to her injury, but the principle of the decision applies to a conveyance made during coverture as well as before.

3. The claim to alimony as such, ceases at the death of the husband, when the wife becomes entitled to dower. If before that event there has been no decree, the representative of the husband is only liable upon his common law liability to furnish his wife with a support, on the ground of which the law implies an assumpsit on the part of the husband, to make a just compensation to any one who furnishes necessaries to the wife, if she be living separately by his fault or consent, unless he has made a suitable provision for her, and actually paid it. No such claim is asserted by or on behalf of any one who may have furnished necessaries to the complainant. And although we regard the provision made for the complainant as being, in view of her husband's estate, wholly incompetent, and although the Chancellor might have decreed something against him for arrearages, in favor of a wife who had been compelled, in consequence of the inadequacy of the provision made for her by her husband, to labor for her support or to depend upon the gratuitous kindness of friends, yet we conceive that unless there be debts to be paid for her past support, this allowance, so far as it is not a mere favor on the one side or a penalty on the other, should operate to diminish the future alimony, and that there is no substantial ground for its allowance when the wife comes to enjoy her legal rights as widow. And as we deem it certain that a widow could not increase her interest in or claim against the estate of her deceased husband, by alleging for the first time after his death, that she had lived separately by his fault, and without provision during his life, we are of opinion that such claim, though asserted before his death, will cease

GAINES
vs
GAINES, &c.

The claim for alimony ceases on the death of the husband and no decree can be rendered in behalf of the widow for previous support.

by that event, and cannot be afterwards availably asserted, unless it has been before ascertained and fixed by decree.

If, therefore, there had been no divorce, and Mrs. Gaines having filed her bill for alimony before the death of her husband, had revived the claim after his death for the previous years, and also claimed dower in his estate, the decree is not erroneous to her prejudice, nor would there in that case be any ground for complaint on the other side.

We therefore proceed to a consideration of the question, how far her rights as they would have existed upon the death of her former husband, had there been no divorce, have been affected by the legislative act relied on to bar or destroy them. The case not having been brought on to a hearing before the death of Thos. Gaines, (an omission which as there was nothing done towards its preparation after the filing of his supplemental answer in May, 1843, may probably be ascribed to the impression produced by the divorce,) the question is not directly presented as to the effect which the divorcing act should have had upon the claim of alimony, if the cause had come on to a hearing before that claim had abated by the death of the husband. But it is certain that the act, if essential to terminate, for all purposes, and in every respect, the relation and incidents growing out of the marriage, and the rights consequent upon it, must have operated at least so far as to have deprived the wife of all claim to future support from her husband, and perhaps of all claim to remuneration for past neglect and suffering. And if it be thus effectual, we can but remark it as a singular feature in the case, and one which we must suppose to be an anomaly in a constitutional government, in which the departments of power are not only carefully distinguished and divided, but the depositories of power in each department are prohibited from exercising, except in cases expressly authorized, any power properly belonging to the others. Can it be consistent with this division and prohibition, that after one department erected for the very purpose of ascertaining and en-

forcing existing rights according to existing laws, had obtained possession of the case, and jurisdiction over the parties and their rights, by a suit regularly before it in a form and for purposes authorized by law, another department not entrusted with the function of deciding upon individual rights as founded in existing laws, prohibited from exercising judicial power, except in a few instances not embracing this, prohibited from passing any law impairing contracts or their obligation, prohibited from taking private property for public use, and having no pretext of a right to take it from A. and give it to B., may upon the application of one of the parties, take the case from the appointed and selected forum, and by its mere *fiat* put an end not only to the contest as existing in the judicial tribunal, but to the right itself, for the enforcement of which the party alleging injury had appealed to the tribunal appointed by the constitution and the law, for the ascertainment of private rights and the redress of private wrongs?

If the Legislature could thus draw to itself by its own will, the jurisdiction of rights actually in litigation before the proper tribunal, and either by its own judgment upon the merits, decide conclusively against the right asserted, or by its own will, independently of the merits absolutely and conclusively destroy it, the right thus to interfere with and control the regular administration of the law in the appointed tribunals, implies a power over the law and its administration, which if it finds no obstruction to its exercise in the existence of a right under and by the law, and in the authorized appeal to the tribunals of the law for its ascertainment and enforcement, would find no greater obstacle in a decree or judgment by which it was already ascertained and attempted to be enforced. If the legislative divorce obtained during the pendency of the suit for alimony, was a termination of the right and a bar to its further assertion in that suit, so if it had been obtained after a decree for the payment of an annual sum as alimony so long as the parties should be separated, it would have been equally a termination of the right to any future payment, and a bar to the further execution of the decree.

*The Legislature have no power where a controversy is pending between individuals growing out of their respective legal rights, to so act as to cast off the rights of one of the parties and his remedy likewise, especially after the parties have acquiesced in & submitted to the judicial forum as the legitimate arbiter of their rights.*

And it seems clear to us, that if the Legislature could not by its direct action or determination upon the rights of the parties, divest the Court which had rendered a decree, of its power to enforce the right adjudged according to the laws from which it was derived, no more can it by such action or determination deprive the Court having lawful possession of the case, and jurisdiction to ascertain and enforce the right, of its lawful power to ascertain and enforce it according to the laws by which it was created and sustained.

Legislative power is that of making laws as a rule of action for all, or for classes, to be defined by law, not to legislate upon individual rights.

It is the province of the Legislature, (so far as individual rights are concerned,) to pass laws as a rule of action and of right for the community at large, or for particular classes, or for individuals under certain circumstances, to be defined by law. It is the province of the Judicial power to administer these laws, by applying them to the facts in individual cases, for the ascertainment of the right and the redress or repression of the wrong. It is essential to the stability and security of individual rights, that they should be determined by pre-existing laws under which they have originated, and by general laws operating upon similar rights, and not by laws made merely for their decision when they come to be contested.

It is the power of the judiciary to carry into effect the rights of parties according to law, not to make laws for each case; and the Legislature to provide law for cases which may occur, not to exercise judicial power in deciding upon individual rights, and cut off judicial inquiry.

It is to avoid the danger of individual rights being determined, not by pre-existing laws, but by a law first promulged in the decision itself, or made for it, or by the secret law of will or discretion, that the judicial department entrusted with the power of ascertaining and enforcing private rights, as created and sustained by law, is prohibited from exercising legislative power, and it is for the same reason that the legislative department entrusted with the power of making, altering and repealing laws, is prohibited from the exercise of the judicial power, which is but the power of applying the existing laws to the facts, and thence deducing and establishing the rights in contest. But it is in vain that the constitution has vested this power exclusively in the judiciary department, and said that it shall not be exercised by the legislative, if when a party alleging injury by the deprivation of a right, has resorted by

the appropriate remedy to the appropriate tribunal for redress, the party accused of wrong, may by an appeal to the Legislature, obtain the passage of an act, not to change the general laws by which all similar cases are to be governed, nor to change the organization or jurisdiction of the Courts by which others as well as himself may be affected, but an act for his own exclusive benefit, to operate only between himself and his antagonist, and by extinguishing the right asserted against him to stifle judicial inquiry, arrest the administration of the law in his case, and save him from those consequences to which the general laws would subject him if he has committed an injury to the rights of another.

The right of dower and distribution, it is true, was not expressly in litigation in the suit. But as the husband, in answer to the claim of alimony, alleged causes for divorce according to the existing law, and prayed for it, and as the wife answered, resisting the prayer, the question of right to a divorce was directly in litigation, and the wife's contingent right of dower, &c., (as well as her right of alimony,) so far as it was dependent upon there being a divorce or not, was involved in the issue, and to defeat both of these rights, was no doubt the object of the prayer for a divorce. But not only must the husband have failed in obtaining a divorce upon his cross bill, on the ground of abandonment, since the separation having been at least consented to, if not compelled by him, was no abandonment, and no other sufficient causes were alleged; but if he had succeeded, though the right of alimony and dower might under those names have ceased, the Court which decreed the divorce would have had a discretionary power to make equitable provision for the wife out of his estate: (*Stat. Law*, 123.) Then the appeal to the Legislature was not only from a litigation regularly commenced by the wife, in assertion of her right to alimony, but also from a litigation regularly instituted by the husband himself, in assertion of his right to a divorce, which if successful would defeat the pending claim to alimony, and the contingent right of dower, &c., which might otherwise become absolute, but would still leave

GAINES
*vs*
GAINES, &c.

The wife filed her bill for alimony, the husband answered, making his answer a cross bill and praying a divorce, and before the hearing obtained a legislative sentence declaring him divorced and died; the widow filed her bill of revivor against the executor and heirs, claiming dower and distribution as widow—Held that the act of the Legislature was void and did not deprive her of dower and distributive share of the decedent's estate.

his estate subject at once to a permanent provision for the wife.

Why then did he appeal to the Legislature? Not for the mere purpose of being relieved from the society of his wife, or of terminating her right to his society. For they had already been separated by mutual consent for five years, without any indication of a probable desire for a re-union, and no decree of the Court could have compelled it. Did he seek a legislative divorce, in order that he might be at liberty to contract again, and for the fourth time, the relation of marriage? His great age, being then about 84 years old, forbids the supposition that the divorce was either sought, or would have been granted on any such ground. But as he had already passed, by a considerable interval, the ordinary limit of human life, as he must have known that his end was approaching near, and that in all probability his wife would survive him by many years; as he must have found reason in the progress of the suit between them to apprehend that the agreement made upon the separation might not be effectual to extinguish or bar her rights as against his estate, and had probably become aware of the Chancellor's power over it, even if divorce were granted; and as the terms of the agreement referred to, and the nature and extent of the provision made by it, (exceeding but little the small amount of the debts due to the wife at her marriage,) showed a determination, evinced also by his giving away his property, even before the separation, that his wife should have no right or share in his estate, the fair inference is that he abandoned the forum which he himself had selected for the trial of his right to a divorce, and appealed to the Legislature for the sole purpose of taking his estate out of the grasp of the Chancellor in which he had voluntarily placed it, and of extinguishing by a legislative divorce, the rights of his wife in his property, which would not have been extinguished, but might have been established by a judicial divorce. And it may be fairly assumed that he resorted to this appeal as a means of effecting this purpose, either because a legislative divorce might be obtained

GAINES
vs
GAINES, &c.

speedily, and before his death, or because apprehending that he could make out no ground for a divorce according to the existing laws by which the judicial tribunal was bound, he sought to effect his purpose by carrying his case to that department, which having power to make the law, was not bound by pre-existing laws, but might, as he supposed, decide it according to the unpromulged law of its will or discretion—or in other words, might decide it by the mere declaration that he be divorced from his wife. It is apparent that the real matter in dispute, from beginning to end in the suit for alimony and in the suit and other proceedings for a divorce, was whether the wife should have an interest in the husband's estate.

The question as thus developed by an analysis of the case, is not simply whether the Legislature may, under any circumstances, constitutionally enact that A. be divorced from B., but whether, when it is manifest that a party, after having sought a divorce in a judicial tribunal, and while his suit is there pending, abandons that forum and resorts to the legislative power for the sole purpose of affecting and defeating the legal and equitable rights of his wife in his property, the divorce granted by the Legislature on such application, can, without disregarding the division of powers and distinction of departments as established by the constitution, and the security of private rights of contract, and of property therein granted, be considered as asserting to any extent, the rights of property involved in the question of divorce. We are of opinion that it cannot.

An act simply enacting that A. be divorced from B., though passed by the legislative department, in the form of a law, falls short of the ordinary definition of law, and more nearly resembles a sentence, which whether founded on a previous investigation of facts under existing laws, or on the mere will or discretion of the Legislature, is in the nature of a decree of rescission or dissolution, and if effectual executes itself by its own terms.

An act declaring simply that A be divorced from B falls short of the definition of a law, and partakes more of the nature of a sentence or decree.

It was said by this Court in the case of *McGuire* vs *McGuire*, (7 *Dana*, 184,) that "so far as the dissolution

McGuire vs McGuire, (7 Dana, 184,) and Ber-

GAINES
vs
GAINES, &c.

thelemy vs John-
son, (3 B. Mon-
roe, 91,) cited,
with approba-
tion which de-
cide that in hear-
ing evidence and
deciding thereon
and granting a
divorce, the Le-
gislature act ju-
dicially. So,
also, in the case
of the State vs
Fry, (4 Missouri
Reps.,) which
decides that a
divorce by the
Legislature was
unconstitutional
being based up-
on ground de-
fined by an act of
the Legislature
giving jurisdic-
tion to the courts
for such cases.

of a marriage may be for the public good, it may be the exercise of a legislative function, but so far as it may be for the benefit of one of the parties in consequence of a breach of contract by the other, it is undoubtedly judicial. And when thus altogether judicial, it may be beyond the authority of the Kentucky Legislature, which under our State constitution cannot exercise any power clearly and purely judicial." And in the subsequent case of *Berthelemy* vs *Johnson*, (3 *B. Monroe*, 91,) the opinion is indicated in emphatic terms, that in hearing and deciding upon evidence that alleged causes of divorce by breaches of the marriage contract existed, and in founding thereon a legislative divorce, the Legislature would be violating the constitutional inhibition against their exercise of judicial power.

In the case of *The State* vs *Fry*, (4 *Missouri Reps.*) the Supreme Court of Missouri decided, after a laborious investigation of principles and authority, that a legislative divorce was unconstitutional, on the ground, as it would seem, that if founded upon the causes defined by previous laws conferring on the Courts authority to grant divorces for such causes, it was clearly the exercise of judicial power prohibited by the constitution, and that if founded upon causes not thus defined, it was if not in that case, also the exercise of judicial power, it was retrospective law, and as such, prohibited by the constitution of that State. It would seem, however, that if founded upon alleged breaches of the marriage contract, deemed by the Legislature suficient ground of divorce in the particular case, though not so declared by previous laws, it would still be the exercise of power in its nature judicial, since it would be a decision upon the law of the contract as applied to the facts of the case. And if there be besides, a combination of the legislative power, the act is not the less within the principle or the letter of the prohibition, that neither of the three departments shall exercise any power properly belonging to the other. Nor can the Legislature, by withholding from the Judiciary the means or right of exercising power properly judicial, invest itself with the right of exercising that power. It

would seem too, that a legislative divorce can be regarded as an exercise of the purely legislative function only, if at all, when it is founded upon the mere will or discretion of the Legislature, without reference to the breach of any existing contract or law. In such a case, however, the act though purely legislative, would be retrospective, so far as it might operate to determine existing rights. And although no express prohibition against the enactment of retrospective laws is found in the constitution of Kentucky, yet it does prohibit the exercise of judicial power by the Legislature, and the passage of laws impairing contracts, and the taking of private property for public use without just compensation. Which last interdict must include the taking of the property of A. and giving it to B. by legislative act, since there could be no plausible pretext for such an act, unless the idea that the public good required the transfer would afford one.

Then, so far as a legislative divorce is founded upon breaches of the marriage contract, whether they might or might not, by previous laws be proper ground for a judicial divorce, affecting the rights of property in the delinquent party, it is the exercise of judicial power prohibited to the Legislature; and if so far as it is not founded upon such causes, it be the exercise of purely legislative power, it is subject to the restriction against taking private property for public use, and cannot operate to take the property of one person and give it to another, without making compensation, because this too is prohibited. And it would be vain to say that the Legislature cannot take the property of A. and give it to B., if upon the petition of the latter, it may annul the title of A. derived from B., with the effect of restoring B. to his title without encumbrance. The power of prescribing by general laws, what causes shall constitute sufficient ground for a divorce, and what shall be the consequences of a divorce founded upon the ascertainment of these causes, is strictly within the legislative competency, and its exercise is entrusted to the legislative discretion. But the power of deciding upon the existence of these causes in individual cases

*Margin note:* GAINES *vs* GAINES, &c.

*Margin note:* The Legislature has power to declare what shall be good grounds for a divorce, but so far as granting of divorces upon causes prescribed involves the rights of property, it is purely judicial.

and of pronouncing the divorce, and enforcing its legal consequences, is strictly judicial. And if it were conceded, as intimated in *McGuire* vs *McGuire, supra*, that the marriage contract is not as a contract wholly removed, like other contracts, from the power of the Legislature to dissolve it in any particular case by special act of divorce, and that the dissolution of a marriage, if required by the public good, may be a legislative function, still it cannot be admitted that a power thus deduced, uncertain upon principle as to its existance, and still more uncertain as to the grounds of its legitimate exercise, can override the express and highly conservative prohibitions in the constitution, intended for the protection of private rights of property. We are of opinion, therefore, that whatever power, to be exercised in view of the public good, the Legislature may have to enact divorces in special cases, as it cannot even for the public good, change the right of private property from one to another without compensation, much less can it do so by a special act of divorce, sought by one of the parties against the consent of the other, with the purpose or effect of operating upon the rights of property incident to the marriage relation, as created and sustained by the general laws applicable to that relation. And the wife having taken no advantage of any privilege afforded by the divorce, she is in no manner precluded from contesting its operation. The fact, that before the passage of the act of divorce in this particular case, the parties themselves had placed the question of divorce, and the rights involved in it, under the jurisdiction of a Court, to be decided by the existing laws, if it does not affect the case in principle, seems at least to make the conflict of powers, and the bearing of the constitution upon it, more palpable than it might otherwise be.

Under these views, and without deciding upon the effect of legislative divorces, so far as they may operate upon the personal relations and abilities or disabilities of the parties, we conclude that the divorce in this case is inoperative as it respects the rights of property involved, and cannot deprive the wife of her interest in

the estate of her husband as it would have existed had there been no divorce. No question arising in this case as to the property acquired or disposed of by the husband other than the divorce, this conclusion applies to the case before us, in which no change of property appears between the divorce and the death of the husband; and we only remark further, that although the repeated and unquestioned exercise of a power which operates upon the community at large, or upon considerable masses, should form a strong, if not an irresistible proof of its legitimate existence, the same consideration cannot be given to the repeated exercise of a power which exhausts its force in determining the condition or rights of two individuals, without any effect upon the rights or interests of the mass of citizens. And as from the nature of the thing, it is not to be expected that acts of such limited operation will attract to any great extent the serious attention or consideration of the legislative bodies, their enactment cannot be regarded as a serious and deliberate assertion of the power involved, made upon such reflection and investigation as should give it a decisive influence.

Judge SIMPSON, though not present at the preparation and delivery of this opinion, was in consultation on the case, and concurred in the conclusion.

Wherefore, the decree is affirmed.

*Morehead & Reed* for appellant; *B. & A. Monroe, Woolley and Burton* for appellees.